UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

JOHN R. ANDREWS JR.,

               Plaintiff,

      v.                                                     21-CV-746-LJV
                                         DECISION & ORDER

TOWN OF WEST SENECA et al.,

               Defendants.
_____


TOM CRONIN, KELLY CRONIN, and
BRITTANY CRONIN,

               Plaintiffs,
      v.                                                     23-CV-14-LJV
                                         DECISION & ORDER

TOWN OF WEST SENECA et al.,

               Defendants.
_____


On June 17, 2021, one of the plaintiffs, John R. Andrews Jr., commenced this

action under 42 U.S.C. § 1983. Docket Item 1.[1] He subsequently amended his

complaint to include claims under *Bivens v. Six Unknown Named Agents of Federal*

*Bureau of Narcotics*, 403 U.S. 388 (1971), the False Tort Claims Act ("FTCA"), and New

York state law. Docket Items 5 and 27. Andrews asserts claims related to the

execution of a search warrant at his home and the criminal investigation and charges

_____

[1] Unless otherwise noted, docket citations are to case number 21-cv-746, and
page numbers in docket citations refer to ECF pagination.

that resulted from that search.  More specifically, he alleges violations of his Fourth and Fourteenth Amendment rights by the defendants: the Town of West Seneca ("West Seneca"); West Seneca Police Department ("WSPD") Lieutenant Detective Kevin Baranowski; WSPD Detective Donald Driscoll; WSPD Officers Jeffrey Coia, Jamie Pappaceno, Gerald Fibich, and Robert Deppeler; United States Customs and Border Protection ("CBP") Officer Jamie Pimentel; a Special Agent for the United States Department of Homeland Security ("DHS"), United States Immigration and Customs Enforcement ("ICE"), and the United States Homeland Security Investigation Department ("HSI"), Glenn Erny; and the United States.  Docket Item 27.

Defendants West Seneca, Baranowski, Driscoll, Coia, Pappaceno, Fibich, and Deppeler (collectively, the "West Seneca defendants") answered the second amended complaint, Docket Item 35, and then moved for judgment on the pleadings, Docket Item 41.  In his response to that motion, Andrews cross-moved to strike the affidavit of Arthur J. Smith, Esq., and the attached exhibits.  Docket Item 46-1 at ¶ 6.

The plaintiffs in case number 23-cv-14—Tom Cronin, Kelly Cronin, and Brittany Cronin (collectively, "the Cronins")—filed their related complaint against the West Seneca defendants, Erny, and Pimentel in January 2023.  Case No. 23-cv-14, Docket Item 1.  The next month, Erny, Pimentel, and the United States (collectively, the "federal defendants") all moved to dismiss Andrews's claims against them.  Docket Items 56 and 57.  A few months later, Erny and Pimentel moved to dismiss the Cronins' claims against them as well.  Docket Item 70.

2

In the meantime, Andrews moved to consolidate case number 21-cv-746 with case number 23-cv-14.  Docket Item 62.  This Court granted that motion and consolidated the cases under Case No. 21-cv-746.  Docket Item 69.

After careful review of the many and voluminous submissions, this Court grants Andrews's motion to strike, and it grants in part and denies in part the West Seneca defendants' motion for judgment on the pleadings.  More specifically, this Court grants the West Seneca defendants' motion with respect to Andrews's state law claims, section 1983 conspiracy claims, and official capacity claims, but denies it with respect to Andrews's *Monell* claims and his section 1983 claims for unreasonable search and seizure, false arrest and imprisonment, malicious prosecution, and failure to intervene. The Court also grants the federal defendants' motions to dismiss.

## **FACTUAL BACKGROUND**[2]

On May 24, 2011, the town court in Alden, New York, granted Andrews a "Certificate of Relief from Disabilities for a previous Class A Misdemeanor for attempted escape from a county correctional facility."  Docket Item 27 ("Andrews complaint") at ¶ 24; Case No. 23-cv-14, Docket Item 1 ("Cronin complaint") at ¶ 24.  The Certificate of

---

[2] On a motion to dismiss or for judgment on the pleadings, the court "accept[s] all factual allegations as true and draw[s] all reasonable inferences in favor of the plaintiff." *Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016); *see L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 429 (2d Cir. 2011). The following facts are taken from Andrews's second amended complaint, Docket Item 27, and the Cronins' complaint, Case No. 23-cv-14, Docket Item 1.

Relief "provided . . . Andrews the right to possess and own firearms."[3]  Andrews complaint at ¶ 25; Cronin complaint at ¶ 25.

"On or around December 2019, . . . Andrews purchased a solvent trap through the commercial website Wish.com."  Andrews complaint at ¶ 26; Cronin complaint at ¶ 27.  Solvent traps have "multiple uses," including "cleaning motors and firearms by catching excess solvent and oil during the cleaning and lubrication process."  Andrews complaint at ¶ 27; Cronin complaint at ¶ 28.  They "may be bought commercially through multiple websites, as well as at various gun stores, Army Navy surplus stores, and auto parts stores."  Andrews complaint at ¶ 28; Cronin complaint at ¶ 29.  But some individuals "convert[] solvent traps into firearm mufflers or silencers, which is illegal."[4]  Andrews complaint at ¶ 29; Cronin complaint at ¶ 30.

"On or around December 28, 2019, the solvent trap [that Andrews had ordered] . . . arrived in the United States at the Los Angeles, California[,] International Mail Facility."  Andrews complaint at ¶ 32; Cronin complaint at ¶ 32.  CBP Officer Pimentel

---

[3] The judge who granted the Certificate of Relief from Disability "failed to include the phrase 'ability to buy, own, and possess firearms.'"  Andrews complaint at ¶ 82.  "Therefore, . . . Andrews applied for a corrected Certificate of Relief from Disabilities in November 2019[,] which was granted on February 11, 2020."  Id.  "The February 11, 2020 Certificate of Relief from Disabilities provided . . . Andrews the right to possess, purchase, or receive a firearm for any purpose."  Id. at ¶ 83.

[4] "The National Firearms Act defines a firearm silencer or muffler to mean 'any device for silencing, muffling, or diminishing the report of a portable firearm, including any combination of parts, designed or redesigned, and intended for the use in assembling or fabricating a firearm silencer or firearm muffler, and any part intended only for use in such assembly or fabrication.'"  Andrews complaint at ¶ 30 (quoting 18 U.S.C. § 921(A)(24)).  "For a solvent trap to be converted into a silencer, the owner must drill holes in all internal cups of the solvent trap as well as the bottom cap to allow a projectile to pass through and to prevent the solvent trap and firearm from exploding."  Andrews complaint at ¶ 31; Cronin complaint at ¶ 31.

"targeted the package," physically examined it, and then "incorrectly classified the solvent trap as a firearms suppressor."  Andrews complaint at ¶¶ 33-34; Cronin complaint at ¶¶ 33-34.  A few days later, "Special Agent Glenn Erny of [DHS, ICE, and HSI in the] Buffalo, New York[,] office was notified that CBP in Los Angeles, California[,] [had] intercepted a package containing a firearm silencer and that [the package] was destined to . . . Andrews's home" in West Seneca.  Andrews complaint at ¶ 35; *see also* Cronin complaint at ¶ 35.  "The notification from CBP Officer Pimentel included misleading photographs of the contents of the package, including a photograph that showed a hole on one end of the solvent trap."  Andrews complaint at ¶ 36; Cronin complaint at ¶ 36.  "The photographs, however, were insufficient to determine whether the solvent trap's internal cups and bottom cap were drilled to convert the legal solvent trap to an illegal firearm suppressor."  Andrews complaint at ¶ 36; Cronin complaint at ¶ 36.

On or around January 3, 2020, HSI notified the WSPD "that a package containing a firearm suppressor was destined to arrive at" Andrews's home, and "HSI requested assistance from WSPD to investigate and seize the package."  Andrews complaint at ¶ 37; Cronin complaint at ¶ 52; *see* Andrews complaint at ¶ 41; Cronin complaint at ¶ 61 ("Detective Driscoll swore that, on January 3, 2020, WSPD detectives were notified that the package was deemed suspicious and was intercepted by agents of CBP at a facility in Los Angeles, California.").  "That notification was reduced to a written complaint, dated January 3, 2020, which was received and acted upon by WSPD [D]etective . . . Driscoll."  Andrews complaint at ¶ 38; *see also* Cronin complaint at ¶ 53.

A few days later, Driscoll "applied for a search warrant . . . from Judge Shannon Filbert of the Town of West Seneca Justice Court."  Andrews complaint at ¶ 39; Cronin complaint at ¶ 59.  "Detective Driscoll swore on the search warrant application that he [had] received information from SA Glenn Erny that . . . Andrews was receiving a firearm silencer, which was to be delivered at [Andrews's residence] during a controlled delivery by law enforcement officers."  Andrews complaint at ¶ 40; Cronin complaint at ¶ 60.  "According to Detective Driscoll, the package was received by 'Law Enforcement Officers in Buffalo[,] NY,' but the search warrant application did not state whether the Buffalo 'Law Enforcement Officers' investigated the package themselves to determine the contents of it."[5]  Andrews complaint at ¶ 43; Cronin complaint at ¶ 63.

"Detective Driscoll wrote that based on his past experience of 26 years on the force" and "involve[ment] in numerous investigations, [Andrews's home and/or vehicle] should be entered without giving notice of authority or purpose" because "giving notice [could] endanger the life or safety of the executing police officers as it [wa]s likely firearms [might] be present."  Andrews complaint at ¶ 46; *see also* Cronin complaint at ¶ 66.  "Detective Driscoll also requested that Judge Filbert allow the seizure of any weapon the incorrectly categorized silencer [wa]s capable of attachment thereto [sic]."  Andrews complaint at ¶ 49.  And "Driscoll . . . applied for the seizure of any evidence that tend[ed] to demonstrate criminal possession of weapons including ammunition, ammunition magazines, firearms boxes, holsters, and any personal papers or

---

[5] Andrews alleges that those officers "should have opened the package to determine whether the solvent trap had been drilled and manufactured to convert the legal solvent trap into an illegal firearm suppressor."  Andrews complaint at ¶ 45; Cronin complaint at ¶ 65.

documents which would tend to identify the owner, lessee, or whomever has custody or control over the premises or items seized." *Id.* at ¶ 50.

"[O]n January 6, 2020, Judge Filbert granted Detective Driscoll's search warrant application," issuing a warrant that "contained all the information from the search warrant application." Andrews complaint at ¶ 51; Cronin complaint at ¶ 69. "The search was required to take place within 10 days of the issuance of the search warrant." Andrews complaint at ¶ 52; Cronin complaint at ¶ 70. Neither the search warrant application nor the warrant itself "note[d that] the item in the package was a solvent trap, which is legal to purchase and own, and that further steps needed to be taken to convert the solvent trap into an illegal firearm silencer." Andrews complaint at ¶ 53; Cronin complaint at ¶ 71. "Moreover, nowhere in the search warrant application d[id] Detective Driscoll . . . differentiat[e] between an unaltered solvent trap, which is entirely legal, and an altered solvent trap, which is illegal." Andrews complaint at ¶ 54; Cronin complaint at ¶ 72.

The next day, WSPD officers Baranowski, Driscoll, Coia, Pappaceno, Fibich, and Deppeler, joined by HSI Special Agent Erny and other officers from HSI, the United States Department of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), ICE, and the United States Postal Inspector's Office went to Andrews' home to execute the search warrant. Andrews complaint at ¶ 55; Cronin complaint at ¶ 73. First, United States Postal Inspector's Office Agent "Carosella hand delivered . . . Andrews the package containing the solvent trap." Andrews complaint at ¶ 56; Cronin complaint at ¶ 74. "[L]ess than five minutes" later, the WSPD officers "made contact with . . . Andrews by knocking on his front door." Andrews complaint at ¶ 57; Cronin complaint at ¶ 75.

"Andrews was taken out through the front door, placed in handcuffs, patted down for weapons," and read his *Miranda* rights.  Andrews complaint at ¶¶ 58-59; Cronin complaint at ¶ 76.  Driscoll and HSI Agent Melania Meyers "were told [that] Andrews would not answer any questions without his attorney."  Andrews complaint at ¶ 60.

At about the same time, Kelly Cronin—Andrews's landlord who lived at the same address but was not at home then—attempted to call him.  Cronin complaint at ¶¶ 77-78.  After Andrews answered the phone and told Kelly,[6] "we have company," Driscoll took the phone away "and asked Kelly if she was the 'owner of the house.'"  *Id.* at ¶¶ 78-79.  When "Kelly responded that she was, . . . Driscoll told her there was some 'illegal activity' at the house."  *Id.* at ¶ 80.  More specifically, Driscoll told Kelly that "Andrews [had] ordered and received an illegal silencer."[7]  Andrews complaint at ¶ 60.

After the arrest, the detectives and agents executed the search warrant.  Andrews complaint at ¶¶ 62, 110; Cronin complaint at ¶ 160.  They confiscated numerous guns, the solvent trap, "[seven] loaded rifle magazines," "a flashlight style silencer," "two firearms denial letters," and "boxes of assorted ammunition."  Andrews complaint at ¶ 63.  Those items were "sent" to the WSPD headquarters, where Andrews also was sent "for questioning."  *Id.* at ¶¶ 63-64.

When Kelly and her husband, Tom, "returned home, [they] found their home in complete disarray and their dogs, who were not outdoor dogs, in the backyard in the

_____

[6] Because the complaint refers to Kelly Cronin as "Kelly" and Tom Cronin as "Tom," this Court does the same.

[7] "By telling [Kelly] Cronin that . . . Andrews ordered and received an illegal silencer, Detective Driscoll put . . . Andrews's living situation into an uncertain position."  Andrews complaint at ¶ 61.

freezing cold without water or food."  Cronin complaint at ¶ 87.  "All the doors to the [p]roperty were unlocked, causing Kelly and Tom to be fearful that they were not safe [because] someone might be in the home."  *Id.* at ¶ 88.  And "[w]hen they walked through their house, it became very evident to Tom and Kelly that [the d]efendants [had] searched it in its entirety."  *Id.* at ¶ 89.  "For example, the drawers to the dresser in [their daughter] Brittany's room were pulled and rummaged through, furniture was pulled away from the wall, plastic evidence bags were left on Tom and Kelly's bed, [and] basement totes were pulled from their shelves and opened."  *Id.* at ¶ 90.

Meanwhile, at the WSPD headquarters, Pappaceno and Baranowski "formally interviewed" Andrews.  Andrews complaint at ¶ 64; Cronin complaint at ¶ 101.  "During the interrogation . . . , the WSPD detectives admitted on multiple occasions that they knew the item purchased by . . . Andrews was a solvent trap and that the unaltered solvent trap was legal for . . . Andrews to purchase and own."  Andrews complaint at ¶ 65; Cronin complaint at ¶ 102.  "In fact, Detective Pappaceno stated that 'ATF t[old him]' that there [we]re 'some steps' needed to convert the solvent trap . . . into an illegal firearm silencer."  Andrews complaint at ¶ 66; Cronin complaint at ¶ 103.  "Nevertheless, Detectives Pappaceno and Baranowski repeatedly asserted that the otherwise legal solvent trap . . . was in fact an illegal firearm silencer merely because the detectives believed that . . . Andrews possessed the knowledge and ability to potentially convert the solvent trap into a silencer as demonstrated by his business as a seller of 'ghost guns.'"[8]  Andrews complaint at ¶ 67; Cronin complaint at ¶ 104.

---

[8] "Notably, those allegations regarding . . . Andrews's knowledge and ability to convert the solvent trap into a firearm silencer were not contained in the search warrant application, and Detective Driscoll merely attested in the search warrant affidavit

Driscoll and Deppeler signed criminal complaints charging Andrews "with [eight] counts of Felony Criminal Possession of a Weapon in the Third Degree."  Andrews complaint at ¶¶ 70-71; Cronin complaint at ¶¶ 107-08.  "Those charges were based on falsified evidence submitted by one or more of the WSPD officers— . . . Kevin Baranowski, Donald Driscoll, Jeffrey Coia, Jamie Pappaceno, Gerald Fibich, and/or Robert Deppeler."  Andrews complaint at ¶ 72; Cronin complaint at ¶ 109.  "Specifically, one or more WSPD officers assembled the 'ghost guns' kept by . . . Andrews . . . , and the WSPD officers falsely claimed that they seized fully assembled guns from" Andrews's residence.[9]  Andrews complaint at ¶ 72; Cronin complaint at ¶ 109.  "In fact, WSPD admitted in its 'Firearms Analysis Report' that . . . Andrews's [seized] Sig Sauer P226 was 'partially disassembled with the slide/barrel assembly separated from the frame.'"  Andrews complaint at ¶ 73; Cronin complaint at ¶ 110.  "WSPD officers

---

submitted to Judge Filbert that the item being sent to . . . Andrews was an illegal firearm silencer."  Andrews complaint at ¶ 68; Cronin complaint at ¶ 105.  "Upon information and belief, the WSPD detectives were informed before the illegal search that the item being sent to . . . Andrews was a solvent trap, but falsely alleged that the item was a firearm silencer in the search warrant application."  Andrews complaint at ¶ 69; Cronin complaint at ¶ 106.

[9] "'[G]host guns,' or firearms that a[re] partially assembled from kits and do not carry serial numbers, are legal as they are not considered 'firearms' by [ATF] under the Gun Control Act."  Andrews complaint at ¶ 74.  "Andrews was engaged in the business of selling 'ghost guns,' which he typically shipped as '80 percent receivers'—meaning that the gun was 80 percent complete, and buyers would have to assemble the final 20 percent themselves."  *Id.* at ¶ 75.  "As part of his business, . . . Andrews would advise his customers how to perform the machining of the ghost gun kits as the kits generally need to be drilled to complete the frame."  *Id.* at ¶ 76.  "However, [he] never sold to his customers fully assembled guns, and the guns that were seized from his home on January 7, 2020 were '80 percent receivers,' which were legal under then-prevailing rules promulgated by ATF as '80 percent receivers' or 'ghost guns' are not considered 'firearms.'"  *Id.* at ¶ 77.  "In other words, . . . Andrews's business was completely legal under then-prevailing rules promulgated by ATF."  *Id.* at ¶ 78.

assembled and tested the Sig Sauer P226 and, when 'analyzed in this manner, the pistol . . . [was] operable.'"  Andrews complaint at ¶ 73 (alteration in original); Cronin complaint at ¶ 110 (alteration in original).

On January 7, 2020, Andrews "was arraigned by Judge Jeffrey Harrington of the West Seneca Justice Court and charged with [eight] counts of Felony Criminal Possession of a Weapon."   Andrews complaint at ¶ 79; Cronin complaint at ¶ 118. Those charges were "based solely on the falsified evidence submitted by WSPD officers regarding the 'ghost runs' that were seized from . . . Andrews's home and assembled by WSPD officers."  Andrews Complaint at ¶ 79.  "Andrews was released but was prohibited from traveling outside Erie County and was not allowed to have any weapons of any kind."  Id. at ¶ 80.  His "restriction on the freedom to travel and to bear arms, along with his required attendance [at] numerous court appearances based [on] a bogus search warrant[,] resulted in feelings of shock, humiliation, and embarrassment."  Id. at ¶ 81.

"On January 14, 2021, . . . Andrews moved before [New York State Supreme Court Justice] Christopher J. Burns . . . to suppress the inventory obtained pursuant to the search warrant and the subsequent search."  Id. at ¶ 84; Cronin complaint at ¶ 132. Justice Burns granted that motion, and "all the inventory of the search was suppressed" on the ground that "the false categorization of the legal solvent trap as an illegal firearms suppressor was [made] knowingly, intentionally, or with reckless disregard for the truth."  Andrews complaint at ¶¶ 84-86; Cronin complaint at ¶¶ 132-34.  "Following [Justice] Burns's decision and order suppressing the evidence obtained by law

enforcement, the prosecutor agreed to dismiss all charges against . . . Andrews." Andrews complaint at ¶ 87; Cronin complaint at ¶ 135.

Andrews then asked Daniel Denz, the Chief of the WSPD, to return the inventory to him. Andrews complaint at ¶ 88. Denz "advised . . . Andrews that he would have to submit an Article 78 Petition to have the inventory returned to him on instructions from the Erie County District Attorney." *Id.* at ¶ 89. As of the date Andrews filed the second amended complaint, the inventory had not yet been returned to him. *Id.*

The Cronins continue to experience negative repercussions as a result of the search of their home and the charges against Andrews. *See* Cronin complaint at ¶¶ 136-41. Among other things, it "has been extremely embarrassing for [them]" and caused "their neighbors [to] become fearful of [them] and avoid all contact with [them] and . . . Andrews." *Id.* at ¶¶ 136, 139.

## **LEGAL PRINCIPLES**

The standard for deciding a Rule 12(c) motion is "the same standard [that applies] to dismissal pursuant to Rule 12(b)(6)." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 429 (2d Cir. 2011) (alterations omitted) (quoting *Johnson v. Rowley*, 569 F.3d 40, 43 (2d Cir. 2009)). "To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but

12

it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

"A case is properly dismissed for lack of subject matter jurisdiction under [Federal] Rule [of Civil Procedure] 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) (citing Fed. R. Civ. P. 12(b)(1)); *see Durant, Nichols, Houston, Hodgson & Cortese-Costa P.C. v. Dupont*, 565 F.3d 56, 62 (2d Cir. 2009) ("'[F]ederal courts are courts of limited jurisdiction' and lack the power to disregard such limits as have been imposed by the Constitution or Congress." (quoting *Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 374 (1978))). "In resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a district court . . . may refer to evidence outside the pleadings." *Makarova*, 201 F.3d at 113 (citing *Kamen v. Am. Tel. & Tel. Co.*, 791 F.2d 1006, 1011 (2d Cir.1986)). "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Id.*

## DISCUSSION

I.    THE WEST SENECA DEFENDANTS' MOTION TO DISMISS AND ANDREWS'S MOTION TO STRIKE

The West Seneca defendants ask for judgment on the pleadings on several grounds.[10] Docket Item 41-28. Andrews opposed the motion and moved to strike materials outside the pleadings on which the West Seneca defendants relied. Docket Item 46-2. For the reasons that follow, Andrews's motion to strike is granted, and the

---

[10] The West Seneca defendants have not moved for judgment on the pleadings with respect to the Cronins' claims.

West Seneca defendants' motion for judgment on the pleadings is granted in part and denied in part.

### A.    Andrews's Motion to Strike

Andrews argues that the West Seneca defendants improperly "introduce and reference" various documents "outside the four corners" of Andrews's second amended complaint and that this Court should not consider those documents.  *See* Docket Item 46-2 at 5-7.  Those documents include:

1) an undated "Mission Statement" for [ATF] ([Docket Item] 41-5);

2) alleged "official statements" by ATF regarding solvent-trap style silencers ([Docket Item] 41-6);

3) an "IMF Interception Tracker Report" completed by co-defendant Jamie Pimentel ([Docket Item] 41-8);

4) photographs allegedly taken by co-defendant Pimentel purporting to depict "the package destined for [Andrews's] residence" ([Docket Items] 41-7 and 41-9);

5) an alleged "request for assistance" from co-defendant Glenn Erny to the . . . West Seneca [d]efendants ([Docket Item] 41-10);

6) "Detective Driscoll's corresponding police report" regarding co-defendant Erny's alleged request for assistance ([Docket Item] 41-11);

7) a "Search Warrant Application" allegedly completed by defendant Driscoll ([Docket Item] 41-12);

8) the "Search Warrant" issued by Judge Filbert that the . . . West Seneca [d]efendants allege was "wholly based on reliable information from federal law enforcement" ([Docket Item] 41-13; see also [Docket Item] 41-1, at ¶ 13);

9) a police report allegedly completed by defendant Driscoll ([Docket Item] 41-14);

10) an alleged "Firearms [A]nalysis [R]eport" that the . . . West Seneca [d]efendants claim "establish[es] that all firearms seized from [Andrews's] home were operable" ([Docket Item] 41-15; see also [Docket Item] 41-1, at ¶ 15);

11) a "certified transcript of [Andrews's] custodial interview with Lieutenant Baranowski and Detective Pappaceno" ([Docket Item] 41-16);

12) a police report allegedly "detailing [Andrews's] arraignment before Judge Harrington of the West Seneca Justice Court" ([Docket Item] 41-17);

13) an alleged "copy of the Information Complaint and Charging Instrument delineating the charges against [Andrews]" ([Docket Item] 41-18);

14) Andrews's [2020] "Certificate of Relief from Disabilities" ([Docket Item] 41-19);

15) a police report allegedly completed by defendant Driscoll dated January 8, 2020 that contains hearsay statements that the . . . West Seneca [d]efendants assert "show[ ] that WSPD officers did not know or have reason to know the subject item was anything but an illegal silencer" ([Docket Item] 41-20);

16) the "Decision and Order of [Justice] Burns to suppress the evidence seized as a result of the search warrant" ([Docket Item] 41-21); and

17) documents that the . . . West Seneca [d]efendants allege "are the Letters of [A]cquittal and [C]ommendation concerning the investigated and justified shooting of suspect Jeffrey Edwards on April 25, 2010" (*see* [Docket Items] 41-20 – 41-22; see also [Docket Item] 41-1, at ¶ 22).

Docket Item 26-2 at 6-7. This Court agrees that it would be improper to consider such documents on a motion to dismiss.

As the Second Circuit has explained, "[t]he purpose of Rule 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief *without* resolving a contest regarding its substantive merits." *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006). "The Rule thus assesses the legal feasibility of the complaint[] but does not weigh the evidence that might be offered to support it." *Id.* To that end, Federal Rule of Civil Procedure 12(d)

clearly states that "[i]f, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."  Fed. R. Civ. P. 12(d).  In such a case, "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."  *Id.*; *see also Glob. Network*, 458 F.3d at 155 ("As indicated by the word 'shall,' the conversion of a Rule 12(b)(6) motion into one for summary judgment under Rule 56 when the court considers matters outside the pleadings is 'strictly enforce[d]' and 'mandatory.'" (alteration in original) (quoting *Amaker v. Weiner*, 179 F.3d 48, 50 (2d Cir. 1999) and *Goldman v. Belden*, 754 F.2d 1059, 1066 (2d Cir. 1985))).

There are exceptions to the conversion requirement for (1) documents that are integral to the complaint and (2) documents of which the court can take judicial notice. *See Glob. Network*, 458 F.3d at 156.  But neither of those exceptions apply here.

First, for documents to be "integral" to a complaint, "a necessary prerequisite for that exception is that the 'plaintiff[ ] rel[y] on the terms and effect of [the] document in drafting the complaint . . . ; mere notice or possession is not enough.'"  *Id.* (alterations in original) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)). Thus, "[i]n most instances where this exception is recognized, the incorporated material is a contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls, but which for some reason—usually because the document, read in its entirety, would undermine the legitimacy of the plaintiff's claim—was not attached to the complaint."  *Id.* at 157.  That is not the case here.

Moreover, although at least some of the documents at issue are the type "of which a court may take judicial notice, it may do so on a motion to dismiss only to establish the existence" of the document, "not for the truth of the facts asserted in [it]." *Id.* (citation and internal quotation marks omitted). And here, the defendants submit the documents "not to establish their existence, but rather to" support their version of the facts. *See id.* "Analysis of such material [i]s therefore not appropriate under the judicial notice exception to the conversion requirement." *See id.*

When a district court is "presented with matters outside the pleadings, Rule 12(b) afford[s] two options." *Chambers*, 282 F.3d at 154. The court can either "exclude[] the extrinsic documents" or convert the motion to one for summary judgment. *See id.* In this case, the Court uses its discretion to strike the extraneous materials, as it would be unfair to compel Andrews to respond to them without the benefit of discovery. *Cf. Lapoint v. Vasiloff*, 2017 WL 976947, at *2 (N.D.N.Y. Mar. 13, 2017) (finding it "inappropriate to consider [a] police report" not integral to complaint on a motion to dismiss).

For all those reasons, this Court grants Andrews's motion to strike.

## B.    The West Seneca Defendants' Motion for Judgment on the Pleadings

### 1.    Effect of the Suppression of the Evidence in the Criminal Proceedings

The West Seneca defendants first contend that Andrews "cannot be permitted to recover damages where he already enjoyed the benefit of dismissal of the criminal prosecution against him." Docket Item 41-28 at 4-7. Essentially, they argue that permitting Andrews to recover damages under section 1983 after the state court suppressed the evidence obtained through the search of Andrews's house would

17

amount to double-dipping.  *See id.*  They base that argument on one Second Circuit

case: *Townes v. City of New York*, 176 F.3d 138 (2d Cir. 1999).

In *Townes*, police officers searched a taxi in which the plaintiff, Victor Townes,

was a passenger and found two handguns that Townes had hidden.  *Id.* at 142.  The

police also found cocaine on Townes's person, and Townes was charged with criminal

possession of a weapon and criminal possession of a controlled substance.  *Id.*  After

the trial court denied Townes's motion to suppress the handguns and cocaine, Townes

pleaded guilty.  *Id.*  "More than two years later, the Appellate Division reversed the

conviction on the ground that the police lacked probable cause to stop and search the

taxicab."  *Id.*  "Eventually, the indictment was dismissed."  *Id.*

Townes then commenced a civil action under section 1983, alleging that the

officers had violated his Fourth Amendment rights and seeking damages for injuries

caused by "his arrest, conviction, and incarceration."  *Id.* at 141-42.  The defendants

moved to dismiss, and the district court granted that motion in part and denied it in part.

*Id.* at 143.  Both sides appealed.  *Id.*

After finding that Townes "enjoyed a clearly established right to be free from an

unreasonable seizure while a passenger in a taxicab," the Second Circuit "proceed[ed]

to consider the related issue of whether the stop and search were a proximate cause of

the damages that the plaintiff [sought]."  *Id.* at 144-45.  It concluded that they were not

for two reasons.

First, the court found that "[t]he fruit of the poisonous tree doctrine [could ]not link

the unreasonable seizure and search to Townes's conviction and incarceration because

th[at] evidentiary doctrine is inapplicable to civil [section] 1983 actions."  *Id.* at 145.  It

also noted that the goal of that doctrine—deterrence of unlawful conduct by law enforcement—had been accomplished adequately by the suppression of the evidence in the plaintiff's criminal proceedings.  *Id.* at 145-46.

Second, the court found that "the unconstitutional seizure and search of Townes's person was not a proximate cause of his conviction because . . . the trial court's refusal to suppress the evidence[ was] . . . an intervening and superseding cause of Townes's conviction."  *Id.* at 146.  In other words, the unreasonable search was not a proximate cause of Townes's conviction because the trial court's denial of the motion to suppress broke the chain of causation between the defendants' conduct and Townes's injuries.  *Id.* at 147.

The Second Circuit ultimately concluded that there was "a gross disconnect between the constitutional violations (Townes's Fourth Amendment right to be free from unreasonable searches and seizures) and the injury or harm for which Townes s[ought] a recovery (his subsequent conviction and incarceration)."  *Id.* at 148.  Therefore, it said, "[n]o Fourth Amendment value would be served if Townes . . . reap[ed] the financial benefit he s[ought]" because he "already [had] reaped an enormous benefit . . . : his freedom, achieved by the suppression of evidence obtained in violation of the Fourth Amendment."  *Id.*

According to the West Seneca defendants, the same analysis applies here. They say that Andrews, like Townes, has "'reaped the enormous benefit' of having [the charges against him] dismissed," so allowing him to "seek financial compensation over and above his already enjoyed benefit of dismissal of the criminal charges would result

in a remedy that would vastly over[-]deter officers and result in a 'wealth transfer that is peculiar, if not perverse.'"  Docket Item 41-28 at 6-7 (quoting *Townes*, 176 F.3d at 148).

But Andrews's case clearly is distinguishable from *Townes* for at least three reasons.  First, Townes sought compensation only for the injury he suffered as a result of his conviction and resulting imprisonment, while Andrews seeks compensation for the allegedly unreasonable search itself, as well as for malicious prosecution and false imprisonment.  *See* Andrews complaint at ¶¶ 92-114, 127-48.  Thus, unlike Townes— whose alleged injury "(a violation of his Fourth Amendment right to be free from unreasonable searches and seizures) d[id] not fit the damages he s[ought] (compensation for his conviction and incarceration)," *Townes*, 176 F.3d at 147— Andrews seeks compensation precisely for the constitutional violations he alleges.  Indeed, the Second Circuit specifically noted that Townes "d[id] not plead conduct tantamount to malicious prosecution or false imprisonment" and suggested that if he had pleaded those claims, the court's analysis may have been different.  *See id.* at 147. And the *Townes* court explicitly acknowledged that "[v]ictims of unreasonable searches or seizures may recover damages directly related to the invasion of their privacy."  *Id.* at 148.

Second, the court in *Townes* based its decision largely on the fact that Townes possessed the weapon and drugs that were the basis of the charges against him and his conviction could not be sustained only because of the illegality of the search.  *See id.*  Under such circumstances, Townes indeed had "reaped an enormous benefit . . . : his freedom," which would not have been the case but for "the suppression of evidence obtained in violation of the Fourth Amendment."  *Id.*  Here, on the other hand, Andrews

says that he is innocent of the charges placed against him—charges that he claims were based on the same false statements that led to the issuance of the warrant. *See* Andrews complaint at ¶¶ 69-79. Based on those allegations, which this Court must credit on a motion to dismiss, Andrews has not reaped anything close to the same sort of benefit that was reaped in *Townes*.

Third, in *Townes*, the state court initially denied the plaintiff's motion to suppress. Thus, the Second Circuit found that "Townes's conviction and incarceration were [not] proximately (or legally) caused by the defendants' constitutional torts" but instead by the "the trial court's failure to suppress the evidence"—which amounted to "a superseding cause of Townes's conviction and imprisonment." 176 F.3d at 146-47. Here, in contrast, the state court granted Andrews's motion and suppressed the evidence. So there is no "intervening and superseding cause" that breaks the chain of causation between the defendants' actions and Andrews's alleged injuries. *See id.* at 146.

In sum, Andrews's action—which seeks damages based on an allegedly unreasonable search, his false arrest and imprisonment, and his malicious prosecution for a crime that he allegedly did not commit—is not barred by *Townes*.

### 2.    State Law Claims against the West Seneca Defendants

Next, the West Seneca defendants argue that Andrews's state law claims against them—for false arrest, false imprisonment, malicious prosecution, and failure to intervene (asserted in the third, fourth, fifth, and sixth causes of action, respectively)—must be dismissed because Andrews did not file a notice of claim as required by New York law. Docket Item 41-28 at 8-9. In response, Andrews "agrees that he did not file a notice of claim" and that "he cannot pursue state[ ]law claims against the . . . West

Seneca [d]efendants."  Docket Item 46-2 at 2.  Andrews's state law claims against the West Seneca defendants therefore are dismissed.

### 3.    Andrews's Section 1983 Claims against the Town of West Seneca

The West Seneca defendants argue that Andrews's section 1983 claims should be dismissed against the Town of West Seneca because Andrews has not pleaded a custom, practice, or policy as required under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).[11]  In *Monell*, the Supreme Court held that "a municipality cannot be held liable solely because it employs a tortfeasor."  *Id.* at 691 (emphasis omitted). "[I]n other words," the Court said, "a municipality cannot be held liable under [section] 1983 on a respondeat superior theory."  *Id.* (italics omitted); *see Reynolds v. Giuliani*, 506 F.3d 183, 191 (2d Cir. 2007) (holding that "*Monell*'s bar on respondeat superior liability under [section] 1983 applies regardless of the category of relief sought" (italics omitted)).  Therefore, "a local government may not be sued under [section] 1983 for an injury inflicted solely by its employees or agents."  *Monell*, 436 U.S. at 694.

Instead, municpalities are responsible under section 1983 only when the plaintiff's injury is "inflicted" by the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy."  *Id.*; *see Outlaw v. City of Hartford*, 884 F.3d 351, 372 (2d Cir. 2018) (explaining that "local governments are responsible only for their own illegal acts[; t]hey are not vicariously liable under [section] 1983 for their employees' actions"

---

[11] Andrews and the West Seneca defendants agree that West Seneca cannot be held liable on a respondeat superior theory.  *See* Docket Item 41-28 at 48-49; Docket Item 46-2 at 2.

(emphasis and internal quotation marks omitted) (quoting *Connick v. Thompson*, 563 U.S. 51, 60 (2011))).  But a section "1983 plaintiff need not prove that his injury was caused by an explicitly stated municipal rule or regulation."  *Outlaw*, 884 F.3d at 372.  In fact, even without "an express municipal policy, [a] plaintiff may prove a municipal custom, policy[,] or practice in several ways."  *Ramos v. County of Suffolk*, 2009 WL 10708571, at *2 (E.D.N.Y. Sept. 8, 2009).

For example, a plaintiff can demonstrate a "policymaker's 'acquiescence in a longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity.'"  *Jeffes v. Barnes*, 208 F.3d 49, 61 (2d Cir. 2000) (some internal quotation marks omitted) (quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989)).  Along the same lines, a plaintiff can show that the municipality "fail[ed] to act," and in doing so "exhibited deliberate indifference to constitutional deprivations caused by subordinates."  *Outlaw*, 884, F.3d at 372-73 (alteration and citation omitted); *see also Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 127 (2d Cir. 2004) (explaining that a plaintiff "injured by a police officer's use of excessive force may establish a basis for municipal liability by alleging that the [municipality]'s policymakers were 'knowingly and deliberately indifferent to the possibility that its police officers were wont' to violate the constitutional rights of arrestees" (quoting *Fiacco v. City of Rensselaer*, 783 F.2d 319, 326 (2d Cir. 1986))).  "[T]o proceed on a deliberate-indifference theory, a plaintiff must first establish 'that the need for more or better supervision to protect against constitutional violations was obvious.'"  *Outlaw*, 884 F.3d at 373 (second set of internal quotation marks omitted) (quoting *Amnesty Am.*, 361 F.3d at 127).

Here, the West Seneca defendants argue that Andrews's allegations "fail to even allow an inference that the Town of West Seneca was aware that its otherwise constitutional policies may be unconstitutionally applied by inadequately trained employees such that they may be considered 'municipal policies.'" Docket Item 41-28 at 13. And, the West Seneca defendants say, "aside from boilerplate allegations . . . [Andrews] has made absolutely no factual allegations demonstrating that a policymaking official of the Town of West Seneca exhibited deliberate indifference to constitutional deprivations caused by the officers, such that the policymaker's inaction constitutes a 'deliberate choice.'" *Id.* at 14 (quoting *City of Canton v. Harris*, 489 U.S. 378, 389 (1989)).

Andrews counters that his "[c]omplaint alleges that, to date, no disciplinary action has been taken against the Town of West Seneca [d]efendants with regard to either of the following: (1) their participation in the false arrest of . . . Andrews based on their search pursuant to a search warrant that they knew or should have known was bogus; or (2) manufacturing false evidence for the prosecution of [Andrews] in the form of assembling 'ghost guns' from parts that [the d]efendants knew or should have known were legal for [Andrews] to possess and sell at the time of the search." Docket Item 46-2 at 19. According to Andrews, this alleged "lack of discipline . . . is consistent with the informal policy or custom of the Town of West Seneca to turn a blind eye to officer misconduct." *Id.*

"Under the failure to supervise or discipline theory, a plaintiff must show that 'the municipality failed to adequately supervise or discipline its employees (thereby implicitly encouraging or ratifying their unlawful conduct) . . . [and] that such a failure of

supervision or discipline was tantamount to deliberate indifference.'" *Buari v. City of New York*, 530 F. Supp. 3d 356, 400 (S.D.N.Y. 2021) (alterations in original) (quoting *Alwan v. City of New York*, 311 F. Supp. 3d 570, 578 (E.D.N.Y. 2018)).  More specifically, a plaintiff can demonstrate deliberate indifference by showing that "the need for more or better supervision to protect against constitutional violations was obvious," but that the policymaker made "no meaningful attempt . . . to investigate or to forestall further incidents."  *Id.* (quoting *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995)).

A failure to supervise or discipline claim generally must allege facts demonstrating that prior incidents put supervisors on notice.  For that reason, courts in the Second Circuit routinely dismiss *Monell* claims based on a single instance of failing to discipline an employee after one alleged unconstitutional event.  *See, e.g.*, *Santiago v. City of Rochester*, 2022 WL 856780, at *4 (W.D.N.Y. Mar. 23, 2022) (failure to discipline employee "after the incident [at issue] does not, standing alone, . . . 'give rise to an inference of an unlawful municipal policy of ratification of unconstitutional conduct within the meaning of *Monell*'" (quoting *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983))); *Askew v. Lindsey*, 2016 WL 4992641, at *5 (S.D.N.Y. Sept. 16, 2016) (collecting cases holding that a single failure to discipline "cannot give rise to an inference of deliberate indifference without further evidence of a municipal policy or practice").

Here, however, Andrews alleges another incident.  More specifically, he says that in April 2010, several WSPD officers—including defendants Deppeler, Baranowski, and Driscoll—were involved in the unjustified shooting of Jeffrey J. Edwards, a West Seneca

resident.  Docket Item 27 at ¶ 174.  "In a police dash cam[era] video of the incident,"
Andrews says, "Edwards can be seen putting his hands out of the driver's side window
trying to surrender."  *Id.* at ¶ 175.  But "[s]econds later, WSPD officers, including
Deppeler, Baranowski, and Driscoll[,] fired more than 60 rounds which hit . . . Edwards
in the back and then the neck," causing "paralysis and ultimately his death four years
later."  *Id.* at ¶ 175-76.  Nonetheless, the Town of West Seneca "cleared [the officers] of
any wrongdoing" and took no disciplinary action against them, despite paying "a
settlement of $4.65 million to . . . Edwards's estate."  *Id.* at ¶ 177.

Drawing all inferences in Andrews's favor as this Court must at this stage, the
Court finds that this incident is sufficient to support his *Monell* claims.  Of course, the
evidence gleaned in discovery may well tell a different story.  But for now, Andrews's
*Monell* claims may proceed.

### 4.    Section 1983 Official Capacity Claims

Andrews sues the various WSPD officers under section 1983 in their personal
and official capacities.  "Personal[ ]capacity suits seek to impose personal liability upon
a government official for actions he takes under color of state law."  *Kentucky v.
Graham*, 473 U.S. 159, 165 (1985) (citing *Scheuer v. Rhodes*, 416 U.S. 232, 237-238
(1974)).  "Official[ ]capacity suits, in contrast, 'generally represent only another way of
pleading an action against an entity of which an officer is an agent.'"  *Id.* at 165-66
(quoting *Monell*, 436 U.S. at 690 n.55); *see, e.g.*, *Ware v. City of Lackawanna*, 2009 WL
3464057, at *2 (W.D.N.Y. Oct. 21, 2009) ("It is settled that a suit against a municipal
officer in his official capacity is functionally equivalent to a suit against the entity of
which the officer is an agent." (internal quotation marks omitted) (citing *Graham,* 473

U.S. at 165-66)).  Thus, "[a]s long as the government entity receives notice and an opportunity to respond, an official[ ]capacity suit is, in all respects other than name, to be treated as a suit against the entity."  *Ware*, 2009 WL 3464057, at *2 (quoting *Graham*, 473 U.S. at 166).  And for that reason, "courts routinely dismiss official capacity claims . . . as redundant or duplicative of claims against the municipality itself."  *Id.* at *3 (quoting *Baines v. Masiello*, 288 F. Supp. 2d 376, 384 (W.D.N.Y. 2003)).

Such is the case here.  Indeed, Andrews concedes "that his claims against the individual defendants in their official capacities are duplicative and should be dismissed."  Docket Item 46-2 at 20 n.7.  Therefore, the section 1983 claims against the individual West Seneca defendants in their official capacities  are dismissed.

## 5.    Unreasonable Search and Seizure Claims

Next, the West Seneca defendants argue that the WSPD officers are entitled to qualified immunity from Andrews's unreasonable search and seizure claim.  Docket Item 41-28 at 17-25.  Andrews responds that the WSPD officers are not immune.  Docket Item 46-2 at 27-28.  This Court agrees with Andrews—at least for now.

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).  A right is clearly established if it "is 'sufficiently clear that every reasonable official would have understood that [his actions] violate[d] that right.'"  *Id.* (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).

A defendant asserting qualified immunity at the pleading stage "faces a formidable hurdle" because "the plaintiff is entitled to all reasonable inferences from the facts alleged." *McKenna v. Wright*, 386 F.3d 432, 434, 436 (2d Cir. 2004). For that reason, qualified immunity generally should not be resolved on a motion to dismiss or for judgment on the pleadings. *See id.* at 436 (noting that a motion to dismiss on qualified immunity grounds "may be granted only where 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief'" (quoting *Citibank, N.A. v. K-H Corp.*, 968 F.2d 1489, 1494 (2d Cir. 1992))); *see also Chamberlain Est. of Chamberlain v. City of White Plains*, 960 F.3d 100, 111 (2d Cir. 2020) (explaining that "a qualified immunity defense presented on a Rule 12(b)(6) motion 'faces a formidable hurdle . . . and is usually not successful'" (alternation in original) (quoting *Field Day, LLC v. County of Suffolk*, 463 F.3d 167, 191-92 (2d Cir. 2006))); *Wesley v. Campbell*, 779 F.3d 421, 433-34 (6th Cir. 2015) ("Although an officer's entitlement to qualified immunity is a threshold question to be resolved at the earliest possible point, that point is usually summary judgment and not dismissal under Rule 12." (alteration, citations, and internal quotation marks omitted)); *Newland v. Reehorst*, 328 F. App'x 788, 791 n.3 (3d Cir. 2009) (per curiam) ("We caution . . . that it is generally unwise to venture into a qualified immunity analysis at the pleading stage as it is necessary to develop the factual record in the vast majority of cases.").

According to the West Seneca defendants, "there is no question" that the WSPD officers who searched Andrews's home and arrested him "did so in good faith and under an objectively reasonable belief that their conduct was appropriate pursuant to a facially valid search warrant at the time." Docket Item 41-28 at 18 (citing Docket Items 41-12

and 41-13). And, they argue, "[t]here is similarly no dispute that probable cause to arrest [Andrews] . . . existed when WSPD officers had reasonably trustworthy information sufficient to form the belief that an offense had been committed by [Andrews]." *Id.* at 19-20 (citing Docket Items 41-3, 41-8, 41-10, and 41-18).

To support their qualified immunity argument, the West Seneca defendants cite several cases with facts somewhat similar to those in the instant case. *See id.* at 19-25 (citing *Walden v. Carmack*, 156 F.3d 861 (8th Cir. 1998); *Sinick v. County of Summit*, 76 F. App'x 675 (6th Cir. 2003); *Messerschmidt v. Millender*, 565 U.S. 535 (2012); and *Green v. City of Mount Vernon*, 96 F. Supp. 3d 263 (S.D.N.Y. 2015)). But almost all of those cases addressed a qualified immunity argument at a later stage of the case. *See Walden*, 156 F.3d at 867 (appeal of denial of motion for summary judgment); *Sinick*, 76 F. App'x at 677 (same); *Messerschmidt*, 565 U.S. at 544 (same).

In *Green*, on the other hand, the court granted in part a motion to dismiss on qualified immunity grounds. 96 F. Supp. 3d at 287-93. More specifically, the court found that the defendant officers were entitled to qualified immunity on the plaintiff's unreasonable search claims with respect to (1) the plaintiffs' claim that the warrant was defective and (2) the plaintiff's claim that "the no-knock entry into the apartment was unreasonable" despite the issuance of a no-knock warrant. *Id.* at 287-89, 291. Among other things, the court noted that the plaintiffs did not allege that the officer who applied for the search warrant "made any false statements or misled the city judge who issued the warrant." *Id.* at 287. "Rather, they merely argue that what was presented to the judge was insufficient to constitute probable cause." *Id.* But the court denied the defendants' motion to dismiss with respect to the plaintiffs' claims that (1) the

defendants continued to search after "allegedly realiz[ing] that they were searching the wrong location," (2) the defendants "destroyed [the plaintiffs' property] during the course of the search," and (3) the defendants unreasonably strip-searched the plaintiffs. *Id.* at 290-93.

Here, Andrews alleges that Driscoll "rel[ied] entirely on the false information forwarded to him by defendants Pimentel and Erny without performing any independent investigation." Docket Item 27 at ¶ 106. As a result, the affidavit "Driscoll presented to Judge Filbert contained materially false information—i.e.[,] that the solvent trap was instead an illegal firearm silencer." *Id.* at ¶ 107 (italics omitted). And, according to Andrews, "Driscoll included in his affidavit materially false information deliberately, in conscious disregard for the truth, and knowing said information to be false." *Id.* at ¶ 109. So unlike the plaintiff in *Green*, Andrews indeed alleges that the defendants "made . . . false statements [and] misled the . . . judge who issued the warrant." *See* 96 F. Supp. 3d at 287.

At the summary judgment stage, the West Seneca defendants may well have a qualified immunity defense. But that will depend on how the evidence pans out in discovery, and for now, Andrews's claims of unreasonable search and seizure may proceed.

### 6. False Arrest and False Imprisonment Claims

"A [section] 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable

cause, is substantially the same as a claim for false arrest under New York law."[12]
*Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (internal citation omitted).  Under New
York law, to prevail on a claim for false arrest, a plaintiff must establish that "(1) the
defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the
confinement, (3) the plaintiff did not consent to the confinement, and (4) the
confinement was not otherwise privileged."  *Ashley v. City of New York*, 992 F.3d 128,
136 (2d Cir. 2021) (alterations omitted) (quoting *Jocks v. Tavernier*, 316 F.3d 128, 134-
35 (2d Cir. 2003)).

An arrest is privileged if it was made with probable cause.  *See id.* ("Probable
cause to arrest is a complete defense to an action for false arrest.").  "Probable cause
exists when one has knowledge of, or reasonably trustworthy information as to, facts
and circumstances that are sufficient to warrant a person of reasonable caution in the
belief that an offense has been or is being committed by the person to be arrested."
*Betts v. Shearman*, 751 F.3d 78, 82 (2d Cir. 2014) (quoting *Williams v. Town of
Greenburgh*, 535 F.3d 71, 79 (2d Cir. 2008)).  An officer is entitled to qualified immunity,
however, so long as there is "arguable probable cause."  *Walczyk v. Rio*, 496 F.3d 139,
163 (2d Cir. 2007) (quoting *Escalera v. Lunn,* 361 F.3d 737, 743 (2d Cir. 2004)).
"Arguable probable cause exists if either (a) it was objectively reasonable for the officer
to believe that probable cause existed, or (b) officers of reasonable competence could

---

[12] Because "[f]alse arrest is simply false imprisonment accomplished by means of
an unlawful arrest," this Court addresses Andrews's false arrest and false imprisonment
claims together.  *See Jenkins v. City of New York*, 478 F.3d 76, 88 n.10 (2d Cir. 2007)
("False arrest and false imprisonment are largely synonymous because an
imprisonment starts at the moment of arrest." (citation omitted)).

disagree on whether the probable cause test was met." *Id.* (internal quotation marks omitted) (quoting *Escalera,* 361 F.3d at 743).

The West Seneca defendants argue that "there is no question that 'arguable probable cause' existed" because "it was objectively reasonable [for] Detective Driscoll to" rely on "statements and information provided by federal law enforcement officers." Docket Item 41-28 at 34. Again, however, the defendants ignore Andrews's allegations that "Driscoll included in his affidavit materially false information deliberately, in conscious disregard for the truth, and knowing said information to be false." *Id.* at ¶ 109. At this stage, the Court must assume the truth of those allegations. And if Driscoll knew that the information he had received from the federal officers and provided in his affidavit was false, then he did not have "arguable probable cause." *See Walczyk*, 496 F.3d at 163.

Once again, the bulk of cases on which the West Seneca defendants rely were not decided on a motion to dismiss. *See Triolo v. Nassau County*, 24 F.4th 98, 102 (2d Cir. 2022) (motion for judgment as a matter of law after trial); *Escalera*, 361 F.3d at 740 (same); *Boyler v. City of Lackawanna*, 287 F. Supp. 3d 308 (W.D.N.Y. 2018) (same), *aff'd*, 765 F. App'x 493 (2d Cir. 2019) (summary order). The only exception is *Green*, in which the court held that the defendants were "entitled to qualified immunity for the handcuffing of [the plaintiff] during the first portion of the search" because they were "act[ing] with good faith reliance on [an] apparently valid warrant." 96 F. Supp. 3d at 294-95. But as discussed above, *see supra* Section I.B.5, *Green* is distinguishable because it did not involve allegations that the officers had made false statements to obtain the warrant. Moreover, in *Green*, the court denied the motion to dismiss with

respect to the officers' actions after they "allegedly knew they were searching the wrong location." *See* 96 F. Supp. 3d at 295.

Again, at the summary judgment stage, the West Seneca defendants may well have a successful qualified immunity argument. But that is a question for another day. Here, the defendants are not entitled to qualified immunity based on the facts alleged in the complaint—and the Court is bound by those facts here. *See McKenna*, 386 F.3d at 436 (for a defendant to be entitled to qualified immunity at the motion to dismiss stage, "the facts supporting the defense [must] appear on the face of the complaint"). This Courts therefore finds that at this stage, the West Seneca defendants are not entitled to qualified immunity on Andrews's false arrest or false imprisonment claims.[13]

### 7. Malicious Prosecution Claims

"In order to prevail on a [section] 1983 claim against a state actor for malicious prosecution, a plaintiff must show a violation of his rights under the Fourth Amendment and must establish the elements of a malicious prosecution claim under state law." *Manganiello v. City of New York*, 612 F.3d 149, 160-61 (2d Cir. 2010) (internal citations

---

[13] The West Seneca defendants also argue that even if Andrews has a claim for false arrest and false imprisonment during the search, he "cannot assert claims for false arrest and false imprisonment based on his confinement *after* the search was conducted, where such search recovered multiple illegal firearms that plaintiff unlawfully possessed." Docket Item 41-28 at 39. More specifically, the defendants argue that Andrews "cannot seek recovery for damages resulting from his post-search arrest where incriminating evidence was recovered, and he was charged with [eight] counts of criminal possession of a weapon." *Id.* at 40. But the allegations in the complaint do not admit any possession of illegal weapons; on the contrary, the complaint alleges that the charges against Andrews "were based on falsified evidence submitted by one or more of the WSPD officers," who "falsely claimed that they seized fully assembled guns from . . . Andrews's property." Andrews complaint at ¶ 72. Indeed, the complaint alleges that all charges were dropped. *Id.* at ¶ 87. So again, the false arrest and false imprisonment claims may proceed at this stage.

omitted).  In New York, those elements are: "(1) the initiation or continuation of a criminal proceeding against [the] plaintiff; (2) termination of the proceeding in [the] plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for [the] defendant's actions."  *Id.* (quoting *Murphy v. Lynn*, 118 F.3d 938, 947 (2d Cir. 1997)).  Andrews certainly has alleged the initiation of a criminal proceeding against him that terminated in his favor.  *See* Andrews complaint at ¶¶ 79, 87.  And as explained above, he also has sufficiently pleaded lack of probable cause based on his allegations that the defendants knowingly used false information to obtain the search warrant and to support the charges.

But the defendants argue that Andrews's malicious prosecution claim also should be dismissed because he has failed to plead the final element: actual malice.  *See* Docket Item 41-28 at 45-48.  This Court disagrees.

"Under New York law, malice does not have to be actual spite or hatred[] but means only 'that the defendant must have commenced the criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served.'"  *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 573 (2d Cir. 1996) (quoting *Nardelli v. Stamberg*, 44 N.Y.2d 500, 502-03, 377 N.E.2d 975, 976 (1978)), *as amended* (May 21, 1996).  Thus, "[i]n most cases, the lack of probable cause—while not dispositive—'tends to show that the accuser did not believe in the guilt of the accused, and malice may be inferred from the lack of probable cause.'"  *Id.* (quoting *Conkey v. State*, 74 A.D.2d 998, 999, 427 N.Y.S.2d 330, 332 (4th Dep't 1980)).

Here, Andrews alleges that the WSPD officers submitted "falsified evidence" to support the charges against him, including by "falsely claim[ing] that they seized fully

assembled guns from . . . Andrews's property." Docket Item 27 at ¶ 72. At this early stage of the case, that is sufficient to plausibly allege that the officers were motivated by "something other than a desire to see the ends of justice served." *See Lowth*, 82 F.3d at 573; *see also Blake v. Race*, 487 F. Supp. 2d 187, 212 (E.D.N.Y. 2007) (concluding that where "one or more of the defendants engaged in intentional misconduct" by falsifying evidence "there is an issue of fact on the element of malice").

### 8. Failure to Intervene

"A police officer 'has an affirmative duty to intercede on the behalf of a citizen whose constitutional rights are being violated in his presence by other officers.'" *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 129 (2d Cir. 1997) (quoting *O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir. 1988)). "Failure to intercede to prevent an unlawful arrest can be grounds for [section] 1983 liability." *Id.* "Liability may attach only when (1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *Jean-Laurent v. Wilkinson*, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008) (citing *O'Neill*, 839 F.2d at 11-12), *aff'd sub nom. Jean-Laurent v. Wilkerson*, 461 F. App'x 18 (2d Cir. 2012) (summary order). "To recover on [a failure to intervene claim], of course, a plaintiff must still overcome the hurdle of qualified immunity." *Ricciuti*, 124 F.3d at 129.

The West Seneca defendants argue that Andrews's failure to intervene claim fails based on qualified immunity. More specifically, they say that "the WSPD officers are entitled to qualified immunity as a matter of law where it was objectively reasonable to believe their acts did not violate [the] plaintiff's constitutional rights [under] the Fourth

Amendment."  Docket Item 41-28 at 50.  But as they do in connection with the other claims addressed above, *see supra* Section I.B.5-7, the West Seneca defendants ignore Andrews's allegations of false statements and fabricated evidence.

According to those allegations—which, again, at this stage this Court must credit—"[e]ach of the . . . West Seneca [d]efendants was present for the unlawful search of [Andrews]'s residence, and therefore each of the officers knew or should have known that . . . Andrews was not in possession of a firearm suppressor."  Docket Item 46-2 at 39; *see* Andrews complaint at ¶¶ 55-72.  But instead of intervening to prevent the unlawful search and charges, Andrews says, "they conspired to manufacture false evidence and claim that [he] was in possession of fully assembled and operable firearms."  *Id.*  At this stage of the litigation, that is enough to raise a viable claim that the defendants failed to intervene.

### 9.  Conspiracy

"[T]o survive a motion to dismiss on a [section] 1983 conspiracy claim, the plaintiff must allege 1) an agreement between two or more state actors, 2) concerted acts to inflict an unconstitutional injury, and 3) an overt act in furtherance of the goal." *Carmody v. City of New York*, 2006 WL 1283125, at *5 (S.D.N.Y. May 11, 2006) (citing *Ciambriello v. County of Nassau*, 292 F.3d 307, 324-25 (2d Cir. 2002)).  "A complaint that includes vague allegations and fails to include specific instances of misconduct will not withstand a motion to dismiss."  *Id.* (citing *Ciambriello*, 292 F.3d at 324-25).  In fact, the "plaintiff must provide a factual basis that supports an allegation that the defendants 'entered into an agreement, express or tacit, to achieve the unlawful end.'"  *Id.* (quoting *Romer v. Morgenthau*, 119 F. Supp. 2d 346, 363 (S.D.N.Y. 2000)); *see Webb v. Goord*,

340 F.3d 105, 110 (2d Cir. 2003) (stating that "plaintiff must provide some factual basis supporting a meeting of the minds" (citation and internal quotation marks omitted)); *Warren v. Fischl*, 33 F.Supp.2d 171, 177 (E.D.N.Y. 1999) (explaining that plaintiffs must "provide some details of time and place and the alleged effects of the conspiracy" (citations and internal quotations marks omitted)).

Here, Andrews alleges that Driscoll "received information from . . . Erny that . . . Andrews was receiving a firearm silencer." Docket Item 27 at ¶ 40. He further alleges that "WSPD detectives were notified [by federal authorities] that [Andrews's] package was deemed suspicious and was intercepted by agents of CBP at a facility in Los Angeles, California." Docket Item 27 at ¶ 41. Those allegations are insufficient to establish a "meeting of the minds" between the federal officers and the WSPD officers to violate Andrews's rights.

Andrews argues that "[t]he allegations in [his c]omplaint are sufficient to demonstrate that it is at least plausible that each [WSPD] officer who searched [Andrews]'s home knew that the search warrant was bogus and based on information that was false." Docket Item 46-2 at 40. And he adds that "[e]ach of the . . . West Seneca [d]efendants then intended to inflict as much harm on [him] as possible by finishing the assembly of [his] 'ghost guns' and then charging him as if the firearms were operable and therefore illegal for him to own." *Id.* But contrary to Andrews's argument, even assuming all that is true, it does not demonstrate that the West Seneca defendants worked together with federal authorities to violate his rights.[14] *See Hickey-*

---

[14] Any claim that the WSPD officers conspired with each other is barred "by the intracorporate conspiracy doctrine, which provides that 'officers, agents[,] and employees of a single corporate entity . . . are legally incapable of conspiring together.'"

*McAllister v. Brit. Airways*, 978 F. Supp. 133, 139 (E.D.N.Y. 1997) (finding that plaintiff had not adequately pleaded a conspiracy where "[s]he merely assert[ed] that [two defendants] testified falsely at [her] hearing" and "then ma[de] the vague and conclusory allegation that they did so in furtherance of a conspiracy between them" (internal quotation marks omitted)).  Andrews therefore has failed to state a claim for conspiracy, and the defendants' motion to dismiss is granted as to the seventh cause of action.

## II.     THE UNITED STATES' MOTION TO DISMISS

The United States has moved to dismiss Andrews's claims against it under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).[15]  Docket Item 56.  More specifically, the United States argues that the FTCA claims should be dismissed for lack of subject matter jurisdiction and failure to state a claim and that the constitutional tort claims should be dismissed because they are barred by sovereign immunity.  *See* Docket Item 56-1.  For the reasons that follow, this Court grants the United States' motion.

### A.     FTCA Claims

"The United States, as sovereign, is immune from suit save as it consents to be sued . . . , and the terms of its consent to be sued in any court define that court's

---

*See Dowd v. DeMarco*, 314 F. Supp. 3d 576, 587 (S.D.N.Y. 2018) (quoting *Chamberlain v. City of White Plains*, 986 F.Supp.2d 363, 388 (S.D.N.Y. 2013)); *see also Ivery v. Baldauf*, 284 F. Supp. 3d 426, 440 (W.D.N.Y. 2018) (finding that section 1983 conspiracy claim against two Rochester Police Department officers was barred under intracorporate conspiracy doctrine).

[15] The United States also moved to dismiss based on insufficient service of process under Federal Rule of Civil Procedure 12(b)(5), but it withdrew that argument in its reply.  *See* Docket Item 67 at 1 n.1.

jurisdiction to entertain the suit." *Liranzo v. United States*, 690 F.3d 78, 84 (2d Cir.

2012) (alternation in original) (quoting *United States v. Mitchell*, 445 U.S. 535, 538

(1980)).  The FTCA, which Congress enacted in 1946, "constitutes a limited waiver by

the United States of its sovereign immunity and allows for a tort suit against the United

States under specified circumstances."  *Id.* at 84-85 (quoting *Hamm v. United States*,

483 F.3d 135, 137 (2d Cir. 2007).  More specifically,

> [t]he FTCA provides jurisdiction in the federal courts and waives the
> sovereign immunity of the United States for "claims against the United
> States, for money damages . . . for . . . injury or loss of property, or personal
> injury or death caused by the negligent or wrongful act or omission of any
> employee of the [g]overnment while acting within the scope of his office or
> employment, under circumstances where the United States, if a private
> person, would be liable to the claimant in accordance with the law of the
> place where the act or omission occurred."

*Id.* at 85 (alterations in original) (quoting 28 U.S.C. § 1346(b)(1)); *see also* 28 U.S.C.

§ 2674 ("The United States shall be liable, respecting the provisions of this title relating

to tort claims, in the same manner and to the same extent as a private individual under

like circumstances.").  "The United States' waiver of immunity under the FTCA 'is to be

strictly construed in favor of the government.'"  *Liranzo*, 690 F.3d at 84 (quoting *Long

Island Radio Co. v. NLRB*, 841 F.2d 474, 477 (2d Cir. 1988)).

The United States argues that this Court lacks jurisdiction over Andrews's FTCA

claims because (1) the claims are barred by the due care exception, (2) the claims are

barred by the detained goods exception, and (3) there is no private analog to the

alleged conduct.  *See* Docket Item 56-1 at 7-13.  In the alternative, the United States

argues that Andrews has failed to state a claim against it for false arrest, false

imprisonment, malicious prosecution, or failure to intervene.  *See id.* at 16-17.

Assuming without deciding that Andrews's FTCA claims are not jurisdictionally barred,

this Court agrees with the United States that Andrews has failed to state a claim against it.[16]

Andrews bases his claims against the United States on the actions of two federal employees: Pimentel and Erny. *See generally* Andrews complaint. The only allegations against Pimentel are that (1) he "targeted the package" mailed to Andrews, *id.* at ¶ 33; (2) "[f]ollowing a physical examination of the package, [he] incorrectly classified the solvent trap as a firearms suppressor," *id.* at ¶ 34, and (3) his "notification" to Erny "included misleading photographs of the contents of the package, including a photograph that showed a hole on one end of the solvent trap," *id.* at ¶ 36. With respect to Erny, Andrews alleges that (1) he "was notified that CBP in Los Angeles, California[,] intercepted a package containing a firearm silencer" that was to be delivered to "Andrews's home," *id.* ¶ 35; (2) he had the package "FedExed to him" so that "Agents of HSI and detectives of the WSPD [could] execute a controlled delivery of [that package] to Andrews as soon as practicable," *id.* at ¶ 44; (3) he gave information to Driscoll that "Andrews was receiving a firearm silencer," *id.* at ¶ 40; and (4) he "joined" the WSPD officers "to execute the search warrant . . . on . . . Andrews's home," *id.* at ¶ 55.

As explained above, the elements of a false arrest and false imprisonment claim under New York law are that: "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the

---

[16] The Court "may assume hypothetical jurisdiction where the jurisdictional issue is statutory in nature." *Butcher v. Wendt*, 975 F.3d 236, 242–43 (2d Cir. 2020) (citing *Doyle v. U.S. Dep't of Homeland Sec.*, 959 F.3d 72, 79 (2d Cir. 2020)); *see Ward v. United States*, 2022 WL 1509672, at *1 (2d Cir. May 13, 2022) (summary order) (resolving appeal of dismissal of FTCA claims on Rule 12(b)(6) instead of jurisdictional grounds).

confinement, and (4) the confinement was not otherwise privileged." *Ashley*, 992 F.3d
at 136 (alterations omitted) (quoting *Jocks*, 316 F.3d at 134-35). But as the United
States notes, the amended complaint is devoid of any facts "indicat[ing that] Pimentel or
. . . Erny were present for, let alone participated in, [Andrews]'s arrest or confinement of
any kind." Docket Item 56-1 at 16-17. Although Andrews alleges that Erny "joined" the
WSPD officers "to execute the search warrant," Andrews complaint at ¶ 55, the
complaint makes no further mention of Erny after that paragraph. It was "the West
Seneca Police Department Detectives" who allegedly "made contact with . . . Andrews
by knocking on his front door." Andrews complaint at ¶ 57. And it was the WSPD
officers who allegedly "falsified evidence." which led to Andrews's allegedly illegal
arrest. *See id.*at ¶ 79 (alleging that "Andrews was arraigned by Judge Jeffrey
Harrington of the West Seneca Justice Court and charged with [eight] counts of Felony
Criminal Possession of a Weapon based *solely* on the falsified evidence submitted by
WSPD officers regarding the 'ghost guns' that were seized from Mr. Andrews's home
and assembled by WSPD officers") (emphasis added)).

There are simply no facts in the second amended complaint that plausibly allege
Pimentel's or Erny's involvement in the alleged scheme to falsify evidence. *See
Rodriguez v. City of New York*, 649 F. Supp. 2d 301, 306 (S.D.N.Y. 2009) (finding that
plaintiff failed to state plausible false arrest claim against assistant district attorney who
"assisted the [police] in their investigation of the plaintiff by contacting" the judge who
[had] signed the warrant when plaintiff did not allege "that the call took place prior to the
arrest, that any information acquired during the call was conveyed to the defendant
police officers prior to the arrest, or that, as a result of the call, [the assistant district

attorney] ordered [the] defendant officers to arrest the plaintiff"). Andrews therefore has

not stated a viable false arrest claim against the United States.

Similarly, malicious prosecution requires that the plaintiff establish: "(1) the

initiation of a proceeding, (2) its termination favorably to plaintiff, (3) lack of probable

cause, and (4) malice." *Watson v. United States*, 865 F.3d 123, 134 (2d Cir. 2017)

(quoting *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003)). But again,

Andrews's second amended complaint "is completely devoid of any facts alleging that

. . . Erny and . . . Pimental initiated, or in any way participated[ in Andrews]'s state

criminal prosecution." *See* Docket Item 56-1 at 17. Nor is there any plausible allegation

of Erny's or Pimental's malice. Indeed, there are no allegations even suggesting that

Pimentel's "incorrect[] classif[ication of] the solvent trap as a firearms suppressor" was

deliberate rather than an inadvertent mistake. *See* Andrews complaint at ¶¶ 33-34.

Likewise, there is no indication that Pimentel included photographs that were

purposefully "misleading." *See id.* at ¶ 36. And there also is nothing alleging any

malice on Erny's part in acting on what he was told and relaying it to the West Seneca

defendants. *See id.* at ¶¶ 35, 44, 55.

Finally, with respect to failure to intervene, there are no allegations indicating that

Erny or Pimental witnessed Andrews's "constitutional rights . . . being violated," let alone

that they "had a realistic opportunity to intervene and prevent the harm" caused by the

West Seneca defendants. *See Ricciuti*, 124 F.3d at 129 (quoting *O'Neill*, 839 F.2d at

11); *see generally* Andrews complaint. The closest Andrews comes to asserting either

federal officer's involvement is his allegation that Erny "joined" the WSPD officers "to

execute the search warrant." *See* Andrews complaint at ¶ 55. But that is simply not

enough to plausibly allege that Erny had any involvement in the West Seneca defendants' framing Andrews. *Cf. Rodriguez*, 649 F. Supp. 2d at 306. As the United States observes, "there are no allegations that . . . Erny [actually] searched the residence, detained [Andrews], arrested [Andrews], or prosecuted [him]." Docket Item 67 at 9.

This Court therefore grants the United States' motion with respect to Andrews's FTCA claims for false arrest and imprisonment, malicious prosecution, and failure to intervene.

### B.    Constitutional Claims

The United States further argues that the first, sixth, and seventh causes of action should be "dismissed because they are barred by sovereign immunity, and the federal government has not waived immunity for [any] of those types of claims." Docket Item 56-1 at 13. Andrews concedes in his opposition that these three causes of action should be dismissed against the United States. *See* Docket Item 64-1 at 2 n.1. Accordingly, this court grants the United States's motion to dismiss with respect to Andrews's federal claims.

### III.    ERNY AND PIMENTEL'S MOTIONS TO DISMISS

Erny and Pimentel move to dismiss Andrews's complaint against them, Docket Item 57, as well as the Cronins' complaint, Docket Item 70.[17]

---

[17] The Cronins did not name the United States as a defendant. As noted above, the West Seneca defendants have not moved for judgment on the pleadings with respect to the Cronins' complaint.

## A.    State Law Claims

This Court already has found that Andrews's allegations about Erny's and Pimentel's alleged actions fail to state a claim for false imprisonment, malicious prosecution, or failure to intervene.  *See supra* Section II.A.  Accordingly, those claims are dismissed against Erny and Pimentel.[18]

## B.    *Bivens* Claims

In *Bivens*, the Supreme Court recognized "an implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights."  *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 66 (2001).  The plaintiff in *Bivens* had been subject to an unlawful, warrantless search and arrest by federal narcotics agents, and the Supreme Court allowed him to pursue a claim for money damages against those agents directly under the Fourth Amendment.  *Bivens*, 403 U.S. at 389-90, 397.

Notwithstanding the creation of a remedy under *Bivens*, the Supreme Court has warned that "the *Bivens* remedy is an extraordinary thing that should rarely if ever be applied in 'new contexts.'"  *Arar v. Ashcroft*, 585 F.3d 559, 571 (2d Cir. 2009) (quoting *Malesko*, 534 U.S. at 69).  In fact, the Supreme Court has extended *Bivens* only twice: once to an employment discrimination claim under the due process clause of the Fifth Amendment, *see Davis v. Passman*, 442 U.S. 228 (1979), and once to a prisoner's Eighth Amendment claim for failure to provide adequate medical treatment, *see Carlson v. Green*, 446 U.S. 14 (1980).  "Since *Carlson* in 1980, the Supreme Court has declined to extend the *Bivens* remedy in any new direction at all."  *Arar*, 585 F.3d at 571.  Indeed,

---

[18] The Cronins assert only federal claims.  *See* Cronin complaint at ¶¶ 142-97.

the Court has gone so far as to say that if "'the Court's three *Bivens* cases [had] been . . . decided today,' it is doubtful that we would have reached the same result." *Hernandez v. Mesa*, 589 U.S. 93, 101 (2020) (alterations in original) (quoting *Ziglar v. Abbasi*, 582 U.S. 120, 134 (2017)).

When asked to extend *Bivens*, "courts engage in a two-step inquiry." *Id.* at 102. First, the court asks whether the claim arises in a "new context" or involves a "new category of defendants." *Id.* (quoting *Malesko*, 534 U.S. at 68). If the claim arises in a new context, the court then asks whether special factors counsel hesitation about extending *Bivens* to that new context. *Id.* And if there is "reason to pause," the court should not extend *Bivens*. *Id.*

Here, Andrews and the Cronins assert *Bivens* claims against Erny and Pimentel for unreasonable search and seizure, failure to intervene, and conspiracy. This Court already has addressed the insufficiency of Andrews's allegations with respect to the claims of failure to intervene and conspiracy. *See supra* Sections I.B.9 and II.A. The Cronins' complaint relies on the same facts for those claims.[19] Thus, this Court finds that all plaintiffs have failed to state a claim for failure to intervene or conspiracy against Pimentel and Erny.

The Court therefore turns to whether the plaintiffs have stated a *Bivens* claim for unreasonable search and seizure against Pimentel and Erny. Pimentel and Erny argue that the plaintiffs cannot raise a *Bivens* claim against them for unreasonable search and

---

[19] Indeed, much of the Cronins' complaint appears to be copied and pasted from Andrews's complaint, *see* Case No. 23-cv-14, Docket Item 1, and there is at least once instance in which it refers to "Mr. Andrews" as the plaintiff instead of the Cronins, *see id.* at ¶ 182.

seizure because it involves a new context and a new category of defendants, and special factors counsel hesitation to extending *Bivens* to address the scenario here. For the reasons that follow, this Court agrees.

A claim arises in a new context if it is "different in a meaningful way from previous *Bivens* cases decided by [the Supreme Court]." *Hernandez*, 589 U.S. at 102 (quoting *Abbasi*, 582 U.S. at 139). "A claim may arise in a new context even if it is based on the same constitutional provision as a claim in a case in which a damages remedy was previously recognized." *Id.* As the Supreme Court has explained, "it is a significant step under separation-of-powers principles for a court to . . . create and enforce a cause of action for damages against federal officials." *Abbasi*, 582 U.S. at 133.

"The question is 'who should decide' whether to provide for a damages remedy, Congress or the courts?" *Id.* at 135 (quoting *Bush v. Lucas*, 462 U.S. 367, 380 (1983)). Thus, in evaluating whether "special factors counsel[] hesitation," courts "must concentrate on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." *Id.* at 136. "If there is a rational reason to think that the answer is 'Congress'—as it will be in most every case—no *Bivens* action may lie." *Egbert v. Boule*, 596 U.S. 482, 492 (2022) (internal citation omitted). "[I]f there is an alternative remedial structure present in a certain case, that alone may limit the power of the Judiciary to infer a new *Bivens* cause of action." *Abbasi*, 582 U.S. at 137. Moreover, "a *Bivens* cause of action may not lie where . . . national security is at issue." *Egbert*, 596 U.S. at 494.

Because the claims against Pimentel and Erny are somewhat distinct, the Court will analyze them separately.

### 1. Pimentel

As noted above, the plaintiffs allege that "Pimentel targeted [Andrews's] package" and, "[f]ollowing a physical examination of the package, . . . incorrectly classified the solvent trap as a firearms suppressor." Andrews complaint at ¶¶ 33-34; Cronin complaint at ¶¶ 33-34. Pimentel then "notified" Erny that "CBP in Los Angeles, California[,] intercepted a package containing a firearm silencer and that it was destined to [Andrews's home]." Andrews complaint at ¶ 35; Cronin complaint at ¶ 35. That "notification . . . was part of ATF's increasing concern regarding the proliferation of solvent traps that are sometimes modified and used as unregistered firearm silencers." Andrews complaint at ¶ 37; Cronin complaint at ¶ 37. But the "notification . . . included misleading photographs of the contents of the package, including a photograph that showed a hole on one end of the solvent trap." Andrews complaint at ¶ 36; Cronin complaint at ¶ 36.

As this Court previously has observed, "CBP officers are a 'new category of defendants' not present in prior *Bivens* claims." *Darwish v. Pompeo*, 2022 WL 831332, at *8-10 (W.D.N.Y. Mar. 21, 2022) (finding that claims that plaintiff "was interrogated and detained by a CBP officer while crossing an international border and was issued a notice of appearance based on false information about his removability" was improper extension of *Bivens*). Moreover, the claims against Pimentel "bear little resemblance to the three *Bivens* claims the Court has approved in the past: a claim against FBI agents for handcuffing a man in his own home without a warrant; a claim against a

Congressman for firing his female secretary; and a claim against prison officials for failure to treat an inmate's asthma."  *See Abbasi*, 582 U.S. at 140.  So the claims against Pimentel present a new context.

Finally, special factors counsel against the extension that the plaintiffs seek. CBP's ability to monitor packages coming into the country implicates national security. *See Egbert*, 596 U.S. at 494.  That alone precludes extension of *Bivens* to this area. *See id.* at 487, 494-97 (dismissing *Bivens* claims against CBP agents for allegedly using excessive force against an innkeeper of an inn that was "a hotspot for cross-border smuggling")*; see also Muzumala v. Mayorkas*, 2022 WL 2916610, at *5 (S.D.N.Y. July 22, 2022) (dismissing *Bivens* claims against DHS and ICE agents because "[s]uits against such officials, like the suit in *Egbert*, implicate national security, and therefore a *Bivens* action against them cannot lie" (italics added)).  At the very least, it gives this Court "reason to pause," and the Court therefore must "reject the request."  *See Hernandez*, 589 U.S. at 102.

For all those reasons, the plaintiffs' *Bivens* claims against Pimentel are dismissed.[20]

### 2.  Erny

The plaintiffs allege that Erny "was notified that CBP in Los Angeles, California[,] intercepted a package containing a firearm silencer and that it was destined to . . . Andrews's home."  Andrews complaint at ¶ 35; Cronin complaint at ¶ 35.  He then had

---

[20] Pimentel also moves to dismiss based on lack of personal jurisdiction.  *See* Docket Item 57-1 at 10-13; Docket Item 70-1 at 8-10.  Because the Court dismisses the claims against Pimentel on the merits, it need not and does not decide whether it has personal jurisdiction over him.

the package "FedExed to him for Agents of HSI and detectives of the WSPD to execute

a controlled delivery of same to Andrews as soon as practicable."  Andrews complaint at

¶ 44; Cronin complaint at ¶ 64.  He subsequently relayed to Driscoll that "Andrews was

receiving a firearm silencer."  Andrews complaint at ¶ 40; Cronin complaint at ¶ 60.

"HSI requested assistance from WSPD to investigate and seize the package," and Erny

later "joined" the WSPD officers "to execute the search warrant [issued] by Judge Filbert

on . . . Andrews's home."  Andrews complaint at ¶¶ 37, 55; Cronin complaint at ¶¶ 52,

73.

      The only allegation that even comes close to being factually similar to *Bivens* is

that Erny "joined" the West Seneca defendants "to execute the search warrant."  But

even that presents a new context because, as Erny and Pimentel observe, "the search

of the house where [the p]laintiffs resided was pursuant to a warrant, the federal

agent[s] and officer[s] were from DHS, CBP[,] and HSI rather than narcotics agents, and

the reason for the search was firearm and gun charges."  Docket Item 72 at 10; *cf.*

*Martinez v. D'Agata*, 2019 WL 6895436, at *7 (S.D.N.Y. Dec. 18, 2019) (distinguishing

*Bivens* because it "involved a warrantless arrest and search of the plaintiff's home,

whereas this case involves an arrest made pursuant to a warrant, outside plaintiff's

home" and because "the type of officers involved in *Bivens* were DEA agents, whereas

here the officers were appointed members of a federal task force").  And DHS's ability to

intercept a package suspected of containing an illegal firearm shipped from abroad

implicates the same national security concerns cited above.  *See supra* Section III.B.1.

That is sufficient at least to give this Court pause at extending *Bivens* to this set of facts.

The Court therefore dismisses the *Bivens* claims against Erny as well.

## **CONCLUSION**

For the reasons explained above, Andrews's motion to strike, Docket Item 46, is GRANTED; and the West Seneca defendants' motion for judgment on the pleadings, Docket Item 41, is GRANTED IN PART and DENIED IN PART.  Andrews's state law claims, section 1983 conspiracy claims, and official capacity claims are dismissed; his *Monell* claims and section 1983 claims for unreasonable search and seizure, false arrest and imprisonment, malicious prosecution, and failure to intervene may proceed. The United States' motion to dismiss, Docket Item 56, is GRANTED, and Andrews's claims against the United States are dismissed.  Erny and Pimentel's motions to dismiss, Docket Items 57 and 70, are GRANTED, and Andrews's and the Cronins' claims against Erny and Pimentel are dismissed.  The Clerk of Court shall terminate the United States, Pimentel, and Erny as defendants.

SO ORDERED.

Dated:   March 31, 2025
         Buffalo, New York


         */s/ Lawrence J. Vilardo*
         LAWRENCE J. VILARDO
         UNITED STATES DISTRICT JUDGE